## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**FILED**

**TONYA SITES,**

AUG 0 4 2010

**Plaintiff,**

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

**v.**

Civil Action No. 2:09cv26
(The Honorable Robert E. Maxwell)

**MICHAEL ASTRUE,**
**Commissioner of Social Security,**

**Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Tonya Sites ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant," and sometimes "Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on Plaintiff's Motion for Summary Judgment and Defendant's Motion for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. Procedural History

Tonya Sites ("Plaintiff") filed an application for SSI on April 17, 2007 (R. 127) and DIB on June 4, 2007 (R. 131), alleging disability since March 30, 2007, due to chronic cervical and lumbar sprains and strains; asthma; and affective disorder (R. 12). Plaintiff's applications were denied at the initial and reconsideration levels (R. 83, 88). On April 30, 2008, Plaintiff submitted a Dire Need Application (R.107). Plaintiff requested a hearing, which Administrative Law Judge Norma

Cannon ("ALJ") held on May 16, 2008 , and at which Plaintiff, represented by counsel, and Dr. Larry Ostrowski, Vocational Expert ("VE"), testified (R. 21-67). On June 17, 2008, the ALJ entered a decision finding Plaintiff had severe impairments, namely chronic cervical and lumbar sprains and strains; asthma; and affective disorder, but was not disabled because there are jobs that exist in significant numbers in the national economy that she can perform (R. 19). On July 31, 2008, Plaintiff requested review of the ALJ's decision by the Appeals Council (R. 5). On December 22, 2008, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-4).

## II. Statement of Facts

Plaintiff was born on November 16, 1982, and was 25 years old at the time of the ALJ's decision (R. 19). Plaintiff completed the 10th grade before quitting at 16 because she had two children. She obtained her GED in 2003 (R. 333).

On June 30, 2006, Plaintiff was seen by Dr. Rajan Masih at Grant Memorial Hospital Emergency Department ("ER") complaining of chest pain, worse on deep inspiration (R. 256). Dr. Masih opined that she would be able to return to work in three days with no work limitations. No current medications were noted. Chest x-rays were normal (R. 260).

On July 16, 2006, Plaintiff was seen by Dr. Ravi Masih at the ER with complaints of chest discomfort under her left breast radiating to her back with deep breaths (R. 262). No current medications were noted. The impression was pleurisy. Chest x-rays were normal (R. 265). Dr. Ravi Masih opined that Plaintiff should be able to return to work the next day with no work limitations (R. 266).

On July 19, 2006, Plaintiff was seen by Dr. Rajan Masih at the ER with complaints of

2

epigastric pain, vomiting, and generalized weakness for a "couple weeks." Toradol was listed as her only medication. Dr. Masih indicated Plaintiff could return to work the next day with no limitations (R. 270).

Plaintiff was seen at Hahn Medical Practices, Inc. the next day with complaints of cough. She was diagnosed with chronic bronchitis and was given Albuterol and Advair. A pulmonary function test was requested (R. 441).

On August 20, 2006, Plaintiff was seen by Dr. Rajan Masih at the ER with complaints of congestion and sore throat. Albuterol was listed as her current medication. Dr. Masih diagnosed sinusitis and bronchitis and indicated she could return to work the next day with no limitations (R. 273-276).

Plaintiff was seen at the ER on September 28, 2006, for complaints of left side pain and nausea (R. 277). She was diagnosed with possible ovarian cyst and prescribed Percocet. The doctor opined she could return to work the next day.

On December 13, 2006, Plaintiff was seen by Gina Sizemore, a Physician's Assistant at Hahn Medical Practices, Inc., for sinusitis and hyperglycemia. Ms. Sizemore discussed the possibility that Plaintiff may develop diabetes in the future (R. 437).

On January 10, 2007, Plaintiff was seen by PA Sizemore with complaints of chest cold, upper respiratory infection, and viral syndrome(R. 436).

On January 11, 2007, Plaintiff presented to the ER with complaints of bilateral earache, sore throat, laryngitis, and chills (R. 281). She was diagnosed with an upper respiratory infection.

Plaintiff returned to the ER two days later with complaints of continued sinus trouble with lightheadedness, dizziness, pressure in her head, sore throat, and cough (R. 284). She was diagnosed

with sinusitis.

On January 24, 2007, Plaintiff presented to the ER, stating: "My chest is hurting – I got hit in the chest around 4 o'clock" (R. 287). She explained that her husband had hit her in the chest with his fist. She was diagnosed with a chest contusion.

On February 4, 2007, Plaintiff was seen by Dr. Brandon Boyce at the ER for a knee sprain (R. 292). She said she "kinda fell on it." Dr. Boyce opined she should be able to return to work in three days with no limitations (R. 294). X-rays of the Plaintiff's left knee showed no evidence of significant degenerative or inflammatory change (R.391).

On February 19, 2007, Plaintiff was seen by PA Sizemore with complaints of lower back pain and not sleeping (R. 435). X-rays of the lumbar spine were taken on February 24, 2007, indicating evidence of bilateral spondylolysis at L4-L5 without spondylolisthesis (R. 390). Sacralization of L5 was noted which represented a normal variant.

On March 18, 2007, Plaintiff was seen at the ER with complaints of lower back pain (R. 295).

Plaintiff was seen by PA Sizemore on March 20, 2007, with complaints of persistent back pain. She said she was unable to sleep and her symptoms were getting worse. Upon exam, Plaintiff's lungs were clear and she was negative for dyspnea on exertion, orthopnea, wheezing or productive cough. She was negative for weakness, light-headedness, syncope, memory loss or headache, and negative for joint pain, muscle weakness or leg pain, but positive for back pain and positive for insomnia. She was in no acute distress and her affect was appropriate. Evaluation of the back revealed some asymmetry; some mild spasm; and decreased range of motion with flexion and hyperextension. Plaintiff appeared in severe discomfort when lying flat on her back. She had

4

positive straight leg raising on the right and was hyporeflexive bilaterally. Ms. Sizemore diagnosed back pain, spondylosis and insomnia, and prescribed Prednisone and Ultracet. She requested an MRI (R.146).

On March 30, 2007, Plaintiff presented to Mountain Medical for complaints of lower back pain into her left flank, with decreased urinary output (R. 482). The next day she returned with continuing lower back and left flank pain (R. 483). She reported she was still having decreased urinary output. She was prescribed Vicoden (R. 492).

Plaintiff stopped working in March 2007. She had been working as a home health aide three hours per day five days per week. March 30, 2007, is Plaintiff's alleged onset date. She stated she had stopped working because of her back (R. 185). She noted she had not been seen by anyone for any emotional or mental problems that limited her ability to work (R. 187).

Plaintiff was seen by PA Sizemore April 4, 2007, for follow-up of pain in her back, flank and left side. Plaintiff had had a urine test and an x-ray and was given Cipro, Hydrocodone and Phenergan which helped some. Plaintiff was negative for dyspnea on exertion, orthopnea, wheezing or productive cough; negative for weakness, light-headedness, syncope, memory loss or headache, and negative for joint pain, muscle weakness or leg pain, but positive for flank pain. Her lungs were clear. She was in no acute distress. Her affect was appropriate. She was referred for a CT scan to check for a kidney stone (R. 427).

Plaintiff filed her application for SSI on April 17, 2007 (R. 185).

Plaintiff was seen by PA Sizemore, May 23, 2007, complaining of depression and asthma brought on by crying spells. Plaintiff's husband had told her he was going to stay with a friend and would be back late. He never returned and had now been gone for a month. "She states that she has

5

talked with the police but because he is Hispanic, they are unable to track him." His real name was not on his identification cards so the police had had trouble tracking his location. "She has just suffered over the last month with multiple issues in this situation." Plaintiff had asthma and it caused her to have several episodes of shortness of breath after crying, and she needed her inhaler refilled.

Upon examination, Plaintiff was negative for dyspnea on exertion, wheezing or productive cough, negative for joint pain, muscle weakness or leg pain, and negative for weakness, light-headedness, syncope, memory loss or headache. Lungs were clear. She appeared to be in no acute distress and her general assessment was "fair." Her affect was appropriate but mood was dysthymic. She was fully alert and oriented. She was tearful intermittently, but denied any suicidal or homicidal ideation. Ms. Sizemore diagnosed depression and anxiety and asthma. She had a lengthy conversation with Plaintiff regarding the issue with her husband and was trying to set up counseling for her. Ms. Sizemore prescribed Cymbalta and refilled Plaintiff's Albuterol inhaler(R. 423-424).

On June 3, 2007, Plaintiff was seen at the ER with complaints of upper chest tightness. She was diagnosed with asthma exacerbation and anxiety, and was treated with an Albuterol nebulizer inhaler (R. 296-298).

On Plaintiff's Disability Report, dated June 4, 2007, she listed only spondylolisthesis as the "illnesses, injuries or conditions" that limited her ability to work (R. 185). She stated this condition limited her ability to work because she could not stand, sit or bend for a long period of time. She could not lay flat on her back and had to sleep in a chair a lot. Under "remarks" Plaintiff stated:

> I have spondylolisthesis of the spine. I have a hard time sleeping at nights. I spend most nights sleeping in a chair. I can not lay flat on my back. It hurts for me to stand a long time. I can not sit for a long time. The doctor told me there was nothing they

can do for it. This is very stressful, because sometimes it does not matter what I do I have a hard time trying to get comfortable with my back. Sometimes when my youngest daughter is playing ball games or in her pageants I have to get up and walk for a while, because I am in so much pain. There is times I have to take my oldest daughter to Morgantown and my back will hurt so bad from sitting that I have to get out of the car for a rest like 3-4 times one way.

(R. 190).

On Plaintiff's Function Report, she stated her daily activities as getting dressed and feeding herself and her children, then picking up a friend "so she can help me do some of my house work" (R. 203). She stated she cooked meals daily and did laundry and "some cleaning" for herself and her children. She had help mowing the yard and doing her floors. She did housework, but some bending and yard work hurt her back. She shopped for food once a week and clothes about every 6 months. She tried to spend time with her children every day but "can't play sports with them or take them on long walks." She spent time talking with others daily, and went to the park regularly to watch her children play. She went out about three times a week. She had no problems getting along with people. Her only change in social activities was "I can't stand for a long time when playing with my daughters at the park." Her conditions affected her ability to lift, squat, bend, stand, walk, sit, and kneel, but not her memory, concentration, understanding, or completion of tasks. She followed instructions "good." She handled stress "sometimes ok. Other times not." She handled changes in routine ok. Under Remarks, Plaintiff stated:

My back problem can be very stressful because I have problems playing with my kids for long periods at a time. I can't sit a long time or stand a long time. My asthma bothers me when I am out in the heat a long time or if I get upset and start cr[y]ing. My depression bothers me because sometimes I don't want to leave my house. My kids will get angry.

(R. 210).

On June 22, 2007, a 911 call was placed for Emergency Medical for abdominal pain (R. 304). Plaintiff transferred to the cot under her own power, and was transferred to the hospital. CT scans taken of the abdomen and pelvis were normal (R. 303). Dr. Masih diagnosed abdominal pain (R. 308).

On July 2, 2007, Plaintiff was seen by PA Sizemore for general weakness (R. 453). Plaintiff stated Cymbalta helped with her depression and she was moving forward with her life. However, she had not gone to the appointment with the counselor. She noted she had applied for SSI and they referred her to Dr. Stein for evaluation. Plaintiff reported some nausea for about three days, stating she had a history of hiatal hernia and was taking nothing for her reflux. She was negative for dyspnea on exertion, orthopnea, wheezing or productive cough; negative for light-headedness, syncope, memory loss or headache but positive for weakness; and negative for joint pain, muscle weakness or leg pain. She was positive for heartburn. She was in no acute distress. Her affect was appropriate and mood was euthymic. She was fully alert and oriented. Ms. Sizemore diagnosed weakness, anxiety and depression, reflux, and nausea, and prescribed Zantac and ordered lab tests. Plaintiff brought a copy of her labwork order from Morgantown, showing: "They are doing PMP22 sequencing. This is an evaluation of Marie Char-cot Tooth[1] [sic] since she has this in her family." One of Plaintiff's young daughters had been diagnosed with the disease, which causes atrophy.

Psychologist Thomas C. Stein, ED.D., examined Plaintiff for the State Disability Determination Service on July 12, 2007 (R. 331). Plaintiff's chief complaint was stated as follows:

---

[1]Actually, Charcot-Marie-Tooth disease (CMT), a group of hereditary conditions characterized by chronic motor and sensory polyneuropathy . . . . characterized by progressive symmetric distal muscle weakness and atrophy starting in the feet and legs, gait disturbance, and absent stretch reflexes. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 537 (31st ed. 2007).

I had spondylolysis in my back and it makes it very painful and if I have to sit for very long or stand in the same position, or if I have to lift, twist, bend over much then the pain gets really worse. Driving to my daughter's appointments in Morgantown (two-and-one-half hours) just about kills me. The next day or so I can hardly move at all. I have to sleep in a chair because laying flat in a bed is extremely painful. Also, I have breathing trouble from asthma and it is especially bad with high temperatures and humidity. Also, it is bad if I get emotionally upset and then I usually get an asthma attack. Also, I have depression and some days it's so bad that I don't feel I can do anything and I don't even want to leave my house or be around other people. That's it.

Plaintiff reported difficulty sleeping. She had no eating disturbances. She had crying episodes two or three times per day. She described her energy level as poor and her mood as "bad and depressed." She denied any suicidal ideations. She also reported having one panic attack per week. She denied any obsessive thinking or compulsive behavior and denied any previous physical and emotional trauma or current posttraumatic stress symptoms.

Plaintiff had two daughters under age ten. Her only medications were Cymbalta and Albuterol. She smoked a pack of cigarettes per day and drank three cans of caffeinated soda daily. She reported being treated for depression by her primary care physician. She had no treatment with a mental health provider. She was treated with medication only.

Upon Mental Status Examination Plaintiff appeared neat and clean with leaning posture and adequate gait (R. 333). She was 5'5 and reported weighing 220 pounds. She was cooperative, polite, and subdued. She maintained good eye contact and evidenced adequate length and depth of verbal responses. She displayed no sense of humor or spontaneous conversation. She was introverted, but had adequate conversation skills. Her speech was relevant, coherent and normal paced. She was fully oriented. Her mood was depressed and her affect subdued. Her insight was adequate and her judgment average. Her immediate memory was moderately deficient, based upon her ability to recall

two of four items. Her recent memory was also moderately deficient. Her remote memory was mildly deficient. She shifted frequently and leaned on the arm of the couch.

Plaintiff reported her daily activities as arising at 8:30, taking care of her personal hygiene, smoking cigarettes, trying to limber up, taking a shower and dressing. She woke up her daughters, helped them dress, fed them, tried to straighten up the house, did light household activities and supervised the children cleaning their bedroom. She fixed lunch and ate with her children and drove to her grandmother's for a short visit. Some days she took the children to the park and watched them play. Other times she came home. Later in the afternoon, she fixed supper, ate with her children, cleaned the kitchen, supervised their bath and bedtime routine, watched some television, and fell asleep in a chair at about 1 a.m. She regularly cooked, occasionally cleaned, and regularly washed dishes and did laundry. She did no yard work or gardening. She occasionally shopped for groceries, ran errands, regularly drove, walked short distances, and occasionally sat on the porch. She did not attend church, belong to any clubs or attend any meetings. She occasionally went to restaurants. She regularly visited with relatives, but rarely socialized with friends or neighbors.

Dr. Stein diagnosed Plaintiff with pain disorder associated with a general medical condition and major depression, single type, non-psychotic (R. 334). He found her concentration moderately deficient, her persistence mildly deficient, and her pace moderately slow.

On July 17, 2007, Plaintiff presented to the ER with complaints of ankle pain after falling down steps (R.310). X-rays showed no evidence of acute fracture or dislocation and were considered normal (R. 309). She was diagnosed with an ankle contusion.

Later that same day EMS was called to Plaintiff's residence by her 7-year-old daughter for difficulty breathing (R. 325). Upon arrival EMS found Plaintiff lying on the couch hyperventilating.

10

She was taken by ambulance to the hospital. She was told to calm down and slow her breathing. At the hospital it was reported that Plaintiff had had a recent family breakup and was tearful (R. 327). She was diagnosed with anxiety and panic attack. She was treated with Ativan.

Plaintiff was seen the next day by PA Sizemore for follow-up for her Emergency Room visit. Plaintiff stated that the Ativan helped significantly. Ms. Sizemore was concerned that Plaintiff may be hyperthyroid which could affect her heart rate. Plaintiff stated she had increasing stressors at home as well as financial problems that were making her feel overwhelmed. Plaintiff was negative for dyspnea on exertion, orthopnea, wheezing or productive cough; negative for weakness, light-headedness, syncope, memory loss or headache; and negative for joint pain, muscle weakness or leg pain. She was positive for panic attacks. Ms Sizemore found Plaintiff in no acute distress. Her affect was appropriate but she was very depressed and anxious and tearful through the exam. She denied any suicidal or homicidal thoughts. She had had a positive H. Pylori test and low TSH. Ms. Sizemore diagnosed: 1) Anxiety/Depression and Panic Attacks; 2) Reflux; 3) Positive H. Pylori; 4) Thyroid Enlargement; and 5) Hyperthyroidism. She prescribed Prevpac and Ativan. Again she prescribed only limited Ativan with no refills. Instead, she discussed ways for Plaintiff to restructure her life to gain control over the stressors that were exacerbating her medical issues. At the end of the appointment Plaintiff was less tearful and seemed improved and encouraged. An ultrasound of her thyroid was scheduled for further evaluation of enlargement (R. 148).

On July 28, 2007, Plaintiff presented to the ER with complaints of hand pain after shutting her hand in the screen door (R.336). An x-ray of the left hand showed no evidence of acute fracture or dislocation (R. 381). She was diagnosed with a "hand contusion."

On July 30, 2007, Plaintiff was seen by PA Sizemore for complaints of being sick for the past

two to three days (R. 449). She believed she was sick with nausea and decreased appetite because of her nerves. She had "a charge" against her old boyfriend for domestic violence but she wanted to drop the charges so she could just get out of town and move on with her life. Plaintiff was tearful intermittently, stating that her husband, who left a couple of months ago, had been found in Mexico, "and she wants to go and find out what is going on and try to work things out."

Plaintiff had no dyspnea on exertion, orthopnea, wheezing or productive cough. Her lungs were clear. She had no weakness, light-headedness, syncope, memory loss or headache, and was negative for joint pain, muscle weakness or leg pain. She did have anxiety and depression. Ms. Sizemore found Plaintiff was in no acute distress. Her affect was appropriate and her mood dysthymic. Ms. Sizemore diagnosed depression and anxiety, and nausea secondary to anxiety. Plaintiff was continued on her Cymbalta and Ativan and was to reconsider treatment with a therapist.

On July 31, 2007, Joseph Kuzniar, Ed.D., a state agency psychologist, completed a Psychiatric Review Technique finding Plaintiff had an affective disorder and anxiety disorder, but that neither was severe (R. 339-352). He found Plaintiff would have mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and had no episodes of decompensation, each of extended duration. As to Plaintiff's Activities of Daily Living, Dr. Kuzniar noted:

> The claimant lives at home with her two children. She takes care of herself and her kids. A friend helps her with the laundry and prepares meals. She enjoys taking her kids to the park. She does not like participating in social activities and being around a lot of people other than her family.

Dr. Kuzniar reviewed the consultative evaluation report by Dr. Stein, and accorded "less weight" to Dr. Stein's opinion that Plaintiff had moderately impaired immediate and recent memory, because

"[t]hese were not evidenced in the function report . . . ." (R. 351).

A thyroid sonogram on July 31, 2007, revealed mild generalized enlargement of the thyroid glands with no evidence of focal thyroid nodule noted (R. 379-380).

On August 4, 2007, Plaintiff was seen at the ER after a motor vehicle accident. She had complaints of neck and back pain (R.356). A CT scan of the head showed "no evidence of acute hydrocephalus, mass effect, midline shift, hemorrhage or edema" and no acute parenchymal process (R. 375). A CT of the cervical spine revealed no fracture (R.376) and lumbar spine x-rays revealed mild degenerative disc disease at L5-S1 level with no fracture or acute process (R.377). The diagnosis was lumbosacral and cervical strain. She was prescribed Motrin and Flexeril.

On August 6, 2007, Plaintiff was seen by PA Sizemore, to go over the ultrasound of her thyroid and TSH levels (R. 447). Ms. Sizemore reported:

> We have been treating her anxiety and her panic attacks with Cymbalta and Ativan. They seem to be helping but she has to take the Ativan almost everyday. I have advised her that I am very concerned that this can create a problem in and of itself. I have had multiple discussions with her about the need for therapy in order to help her work through a lot of tragedies she is facing and a lot of the challenges that are ahead of her. She has a court case that should be pending with a charge against an old boyfriend and her husband left several months ago and is now living in Mexico. She is still trying to make contact with him. So there are multiple issues along with her children and their difficulties that she is facing. Patient states that the medicines are helping well but she states she does not have time to see the therapist because of trying to get her daughter to her physical therapy and trying to get them ready to go back to school, trying to get her car fixed and other multiple issues. Once again, I have advised her of my concerns.

Plaintiff was assessed as negative for dyspnea on exertion, orthopnea, wheezing or productive cough; weakness, light-headedness, syncope, memory loss or headache; negative for joint pain, muscle weakness or leg pain; but positive for anxiety and panic attacks. She was in no acute distress, her affect was appropriate and her mood was euthymic. She was fully alert and oriented. She was

not tearful. Her TSH was within normal limits and her lungs were clear.

Ms. Sizemore diagnosed thyroid enlargement, anxiety, and panic attacks. She prescribed Ativan for ten days with no refills, and referred Plaintiff to Dr. Hahn regarding her Ativan intake. Plaintiff "finally agreed to meet with [counselor] Marlene Kline after school starts for her children" (R. 447). There is no record of Plaintiff having done so, however.

On September 5, 2007, Plaintiff was seen by PA Sizemore for headaches with complaints of dizziness and neck pain/strain. X-rays were requested and Ultracet was prescribed (R. 445). Five views of the cervical spine were taken at Grant Memorial Hospital on September 13, 2007, and were found to be normal (R. 373-374). Plaintiff was diagnosed with headache with dizziness, and neck pain/strain.

On September 23, 2007, Plaintiff was seen at the ER with complaint of sore throat (R.359). She was diagnosed with pharyngitis and prescribed a Z-pack and Motrin.

On September 26, 2007, Plaintiff was seen by PA Sizemore, with complaints of intermittent headache, back and shoulder pain. She denied any other problems. She was diagnosed with intractable unresolving headache and cognitive deficit. CT scan and MRI's were requested (R. 443).

Stephen B. Nutter, M.D., examined Plaintiff for the State Disability Determination Division and prepared a report dated September 27, 2007 (R. 362-366). Dr. Nutter first noted Plaintiff was a 24 year old female claiming disability due to back pain and anxiety. She had not had physical therapy. Her active medications were Albuterol inhalant, Cymbalta, lorazepam and oxycodone. Plaintiff reported having the back pain for three years, but the neck pain only since an MVA two months earlier. Plaintiff also reported shortness of breath, and reported she could walk only ½ mile before stopping. She complained of coughing, but no wheezing. She was diagnosed with asthma

but had not been hospitalized for breathing problems or pneumonia. She used inhalers and did smoke. She reported headaches daily at a pain level of 6 out of 10.

Upon examination, Plaintiff's leg lengths were equal (R. 363). She ambulated with a normal gait and did not require an ambulatory assistance device. She appeared stable at station and comfortable supine and sitting. Her intellectual functioning seemed normal and recent and remote memory for medical events was good. Her chest had symmetrical excursion. Respiration was even without use of accessory muscles. Breathing was not labored. Lungs were clear with no rubs, wheezes, rales, or rhonchi. Chest was clear to percussion.

Range of motion of the upper extremities was normal. The hands were normal, but there was give away weakness with grip strength testing. She could write and pickup coins without difficulty. Both knees showed evidence of tenderness. Range of motion was normal except knee ROM was reduced due to obesity. There was pain and tenderness with range of motion of the cervical spine, but no spasm. There was back pain with testing of the lumbar spine but no evidence of muscle spasm. There was tenderness to light touch in the lumbar area and to normal palpation of the thoracic and lumbar spine. Straight leg raising was normal both sitting and supine. She could stand on one leg without difficulty. Hip range of motion was reduced due to back pain. Plaintiff could walk on her heels and toes, but had difficulty with tandem gait due to balance. She could squat but with difficulty due to back pain.

Ventilatory function tests performed that day were normal (R. 367).

Dr. Nutter noted his findings were not consistent with nerve root compression. He diagnosed chronic cervical and lumbar strain without evidence of radiculopathy, and asthma (R. 365).

An MRI of the cervical spine on October 3, 2007, revealed minimal central disc herniation

15

at C6-C7 without spinal cord compression or nerve root impingement. The remainder of the cervical neural canal and cervical spinal cord were entirely unremarkable (R. 149 and 372). An MRI of the lumbosacral spine was also performed and revealed normal appearing vertebral bodies with no evidence of marrow replacement or compression deformities. There was mild degenerative disc disease seen with a small bulging annulus at L5-S1 without evidence of nerve root impingement. There was also a small left paracentral disc herniation at T12-L1 and a small central disc herniation at L1-L2 both with no evidence of spinal cord compression (R. 150 and 370). A CT of the head was normal (R. 371).

Plaintiff's application was denied at the Initial level on October 10, 2007.

On October 23, 2007, Plaintiff was seen at the ER with complaint of increased back pain that day (R.394). She was diagnosed with chronic back pain.

Plaintiff's Disability Report on Appeal described back and neck problems as her only new mental or physical conditions or changes to her conditions (R. 221). Her illnesses affected her ability to care for her personal needs because they caused "[d]ifficulty standing or walking, cooking meals because of pain" (R. 224). There had been no changes in her daily activities since her last disability report in June 2007.

On December 1, 2007, Plaintiff was seen at the ER for complaints of chest pain/panic attack, breathing too fast and crying after receiving "bad news earlier" (R. 495-496). Her boyfriend had left. She was diagnosed with a panic attack and prescribed Ativan (R. 499).

On December 5, 2007, Plaintiff was seen by PA Sizemore, for refills of her medications and for back pain. No examination is noted that date. Plaintiff was diagnosed with herniation of the cervical and lumbar spine (R. 442). She was prescribed Cymbalta, Lorazepam, and Ultracet.

On December 29, 2007, Plaintiff presented to Mountain Medical for complaints of head and nasal congestion (R. 484).

On January 10, 2008, Plaintiff presented to Mountain Medication for tonsillitis (R. 485). She was prescribed an antibiotic and Vicodin.

On January 10, 2008, State agency reviewing psychologist Joseph A. Shaver, Ph.D., completed a Psychiatric Review Technique ("PRT") (R. 399-412). He found Plaintiff had an affective disorder, anxiety-related disorder, and a somatoform disorder, but that none was severe. He opined that she had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and had had no episodes of decompensation.

Dr. Shaver noted Plaintiff's function report of only two months earlier, stating she lived with and took care of her two minor children; prepared meals and took them to school; had help from her grandmother with housework; performed personal care tasks but experienced pain; was able to go out alone and drive; shopped once or twice per week for short periods of time due to pain; and went to church regularly. He found her to be generally credible regarding mental functioning and found only mild impairments in functioning. He opined that she had the mental capacity to maintain gainful employment on a sustained basis.

On January 11, 2008, State agency reviewing physician Fulvio Franyutti, M.D., completed a Physical Residual Functional Capacity Assessment ("RFC") based on cervical and lumbar degenerative disc disease with neck and back pain; obesity; and asthma (R. 413-420). He found Plaintiff could lift and/or carry 50 pounds occasionally, 25 pounds frequently; could stand/walk about 6 hours in an 8-hour workday; and could sit about 6 hours in an 8-hour workday. She could

17

occasionally climb and crawl, and frequently balance, stoop, kneel, and crouch. She should avoid concentrated exposure to extreme cold, vibration and hazards, and avoid any exposure to fumes, odors, dusts, gasses or poor ventilation. Dr. Franyutti found Plaintiff to be partially credible, with her allegations partially supported by findings.

SSA denied Plaintiff's claim at the Reconsideration level on January 11, 2008.

On January 12, 2008, Plaintiff was seen at the ER with complaints of left knee pain. Plaintiff said she had had a four wheeler accident when she was 13 years old and injured the knee. Her knee started hurting while she was walking and felt like it was "giving out" (R. 500-502). She was diagnosed with knee strain/sprain and possible patellofemoral syndrome (R. 503).

Plaintiff presented to a physician's assistant at Hahn Medical Practice on January 17, 2008, for complaints of left knee pain (R. 456). She said she had torn the ligaments and cartilage 11 years earlier and was now having pain on a scale of 8 out of 10. Upon examination her knee was tender. She was diagnosed with left knee pain and prescribed Lortab and Ibuprofen and was referred for x-ray.

On January 21, 2008, Plaintiff presented to Mountain Medical for complaints of left knee pain (R. 487). She said she had fallen two days earlier, spraining her right elbow and shoulder. She also reported having had torn ligaments as a teenager, with episodic problems since. It was noted she had a marked limp. X-rays showed a large avulsion vs. calcification at the posterior joint space with early degenerative symptoms (R. 458). She was diagnosed with left knee pain with both MCL/LCL strain and decreased flexion due to pain (R. 488). She was given a knee immobilizer and prescribed diclofenac, an NSAID (nonsteroidal anti-inflammatory drug).

An MRI of the left knee taken at Grant Memorial Hospital on February 7, 2008, revealed

extensive bone contusion involving the medial femoral condyle, tear of the posterior horn in the body of the medial meniscus, and partial tear of the ACL (R. 505).

On February 27, 2008, Plaintiff was seen for pre-admittance at the hospital for arthroscopy of her knee, which she underwent on March 3, 2008 (R. 506-507).

In her Disability Report dated March 30, 2008, Plaintiff stated the only change to her conditions was that she had had knee problems and surgery (R. 243). She stated that she now needed help to take care of kids, yard work, cooking, etc. (R. 247). "Depression, anxiety, makes it hard, panic attacks make me unable to function at least 3 hrs a week." Since she last completed a disability report in October 2007, "Panic attacks drain me to 2 days when they happen, more often now 1x a week at least."

On April 1, 2008, Plaintiff underwent a Comprehensive Psychological Evaluation, performed by Licensed Psychologist Kathy Murphy, M.A. "[i]n order to present more information to Social Security regarding her disability claim" (R. 508, 510). She also stated the evaluation was recommended by her Social Security case manager, who told her she should "involve herself in services, as it would make a better presentation to the judge who will be reviewing her case." Plaintiff's grooming and hygiene were adequate and she was fully oriented and her memory was intact. Plaintiff reported having been physically abused by her mother's boyfriend when she was a child. She had her first child in 1998 when she was 15. At age 17 she married and had another child. That marriage ended in divorce in 2005, and she married Sole Morales in 2006. They were married one year prior to divorce after he deserted her. She had been living by herself with her two children in the past year, with significant support of family and friends. She denied any history of abuse besides the physical abuse by her mother's boyfriend.

Plaintiff denied any significant head injury, seizure or major surgery. She described neck and back pain from degenerative disc disease and reported having asthma for which she had an Albuterol inhaler and acid reflux for which she took Prevacid.

Plaintiff began receiving mental health services in March 2008 "at the recommendation of her Social Security case manager." She had been prescribed Cymbalta and Ativan by her family physician, Dr. Masih, but indicated she was "miserable," had crying spells, slept only a couple hours at a time, and had no appetite. She had low energy and had her family come in and help her with household chores and responsibilities. She described panic attacks that occurred on a regular basis and involved difficulty breathing, tightness in her chest, shaking, crying and numbness in her arms. They lasted an hour to an hour-and-a-half. She avoided places where she may have a panic attack. They thus far occurred in the presence of some of her family and friends, who assisted her with getting medication to help decrease the panic feelings. Some days she had an increase in energy and would clean the house. She had difficulty with order and expected all her things to be put away exactly as she wanted them to be. She may get up three to four times a night to check whether she turned off the stove or if toys were in their proper places.

Ms. Murphy reported that Plaintiff came easily into the testing situation. Her affect was appropriate. She became tearful at times while talking about her past history and relationship struggles. She made good eye contact and showed a wide array of emotions. There was no indication of a thought disorder. Ms. Murphy diagnosed Major Depressive Disorder, Single Episode; Anxiety Disorder, NOS, and Personality Disorder NOS (Dependent and Avoidant Traits) (R. 513).She assessed her GAF as 60,[2] right at the cut-off between mild and moderate symptoms or

---

[2]A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school**

difficulties. Ms. Murphy recommended Plaintiff continue to engage in psychiatric services where her symptoms could be evaluated and her medications monitored on an as needed basis, and attend therapy. Her prognosis was generally good.

On April 1, 2008, the same day Plaintiff was evaluated by Ms. Murphy, she was also evaluated by psychiatrist Christine Goldizen, M.D., upon referral by counsel (R. 463). Ms. Goldizen completed a "Mental Impairment Questionnaire" on April 2, 2008. She expressly noted on the form that she had seen Plaintiff only the one time, for an evaluation. She also noted that results of the psychological evaluation/testing were "pending" (R. 467).

Dr. Goldizen diagnosed Plaintiff with Major Depressive Disorder, single episode, moderate; and Anxiety Disorder, NOS. She also rated her GAF as 60. She found Plaintiff had impaired memory and concentration, constricted affect, and depressed mood. She reported Plaintiff was treated by her primary care provider with medications which caused sedation, mental slowing, and decreased cognitive functioning. Her prognosis was unknown. Dr. Goldizen opined that Plaintiff's impairments would be expected to last at least a year, and began "several years ago." Her depression and anxiety increased Plaintiff's experience of pain, and chronic pain in turn brings on depression and anxiety.

Dr. Goldizen opined that Plaintiff's impairments would cause her to be absent from work more than three times a month (R. 465). Dr. Goldizen also opined that Plaintiff would have a "poor" ability to maintain attention for two hour segments; maintain regular attendance; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a

---

**functioning** (e.g., few friends, conflict with peers or coworkers). <u>Diagnostic and Statistical Manual of Mental Disorders</u> ("<u>DSM-IV</u>"), 32 (4th ed. 1994). (Emphasis in original).

consistent pace without an unreasonable number and length of rest periods; and travel in an unfamiliar place. She would have a "fair" ability to perform most other work-related functions.

Dr. Goldizen opined that Plaintiff would have a "marked" restriction of activities of daily living; "moderate" difficulties maintaining social functioning; "marked" deficiencies of concentration, persistence or pace; and had three episodes of deterioration or decompensation in a work or work-like setting.[3],[4]

Rajan Masih, M.D., provided a Medical Source Statement of Ability to Do Work-Related Activities dated April 28, 2008 (R. 468). Dr. Masih opined that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand/walk at least two hours in an 8-hour workday (he did not check "about 6 hours in an 8-hour workday"); and sit less than about 6 hours in an 8-hour workday (again, he did not check "about 6 hours in an 8-hour workday"). She could occasionally perform all posturals. She had no other limitations.

On May 6, 2008, Plaintiff presented to Mountain Medical for complaints of back and neck pain (R. 490). She was taking Tylenol and Motrin without relief. She was scheduled for cortisone injections on May 13. She wanted to sleep all the time and her panic attacks were worse – occurring three to four times per week. She said she was tested three weeks ago for Charcot-Marie-Tooth disease. She was prescribed Vicoden.

Dr. Rajan Masih wrote an undated letter, which was faxed to the ALJ on May 16, 2008, the day of the hearing (R. 516). The letter states, in *toto*:

---

[3]These limitations meet the mental listings for disability.

[4]The actual report from Dr. Goldizen's Psychiatric Evaluation was not submitted until August 27, 2008, two months after the ALJ's decision. A summarization will be included with that of other records submitted after June 2008, below.

To Whom it May Concern:

With Tayna [sic] Morales' physical and emotional disabilities will make it impossible to hold a full or part time job in the economy [sic].

During the administrative hearing held on May 16, 2008, Plaintiff testified that she was 25 years old and had two children ages nine and eight. She had her GED. She weighed 173 pounds and was 5'5" (R. 27). She drove approximately 350 miles a week when she had doctor appointments for either herself or her daughter with a neurologist in Morgantown. She smoked about half a pack of cigarettes a day but was trying to quit. Her doctor recommended she quit because of her asthma (R. 28). She quit her job as a home health care worker in March of 2007, because she had a lot of back and neck problems and her doctor found spondylosis of the spine. Quitting her job led to her depression and panic attacks. She was on Medicaid and had family and friends come to her house to help her do the housework and look after her children (R 29-30). She had had panic attacks for about a year to a year-and-a-half but had never been hospitalized for them (R. 31). When asked about her daily activities the Plaintiff testified:

> I mean, I get up, I take my shower, my friend stays there with me because I have degenerative arthritis in my left knee and I have problems with my knee and with my degenerative disk in my lower back, I've been falling down a lot and I had someone with me watching me. They don't go to the bathroom with me, but they're in the house while I take my shower to make sure I don't fall because I have been falling lately and then I get my kids dressed - - they kind of dress themselves and then I take them to school, and I've got no energy to really do anything. I'm just - - I got somebody else that comes in and helps me to do most of it because it hurts for me to bend and it hurts for me to bend over a lot or to do my cleaning, mopping my floors and I got somebody to help me to do all that and both girls have been great to me, because they know the troubles I'm having and they know about the pain and the health problems.

(R. 32-33)

Plaintiff testified she had never been to physical therapy or a chiropractor for her back or

23

knee problems (R. 33). She started counseling only about two months earlier, after her psychological evaluation, and went about once a month (R. 36).

Plaintiff testified she had worked as a CNA for about a year and a half and had to clean the homes, do laundry, prepare meals, scrub floors, and clean tubs. One woman she worked for could not do anything and she had to "basically carry her." It hurt her back to do so (R. 37). She also worked as a cabinet maker for three years which required lifting and she started noticing pain in her back. Her first job was with Pilgrim's Pride for about two years and she hung chicken on the line (R. 39).

Plaintiff testified her medications included Cymbalta, Xanax, Albuterol, Prevacid and Vicodin (R. 43-44).

The ALJ then asked the Vocational Expert ("VE"), Dr. Larry Ostrowski, if there would be any jobs available in the national economy for a hypothetical individual of Plaintiff's age, education, and work experience, who would be able to perform a range of light work (except no climbing of ropes, ladders or scaffolds or anything of that nature), needed to avoid extreme cold, needed to avoid any kneeling or crawling, needed a sit/stand option, may have some slight limitation with pushing and pulling because of her knee and back, needed to avoid vibrations, fumes, dust, odors, and gasses, and things of that nature, and hazards such as dangerous moving machinery and unprotected heights. She also would need an entry level job, unskilled, routine and repetitive, with nothing that required intense concentration, working with things as opposed to people, and with limited contact with the public. The VE testified Plaintiff would not be able to do her prior relevant work. He testified Plaintiff could work as an office helper, storage facility counter clerk or mail clerk which would be at the light exertional level. At the sedentary level, there would be the work of a document preparer,

table worker or an ampoule sealer. Depending upon the employer, the VE testified a person could miss one to two workdays a month but that an employer would want the individual to stay on task at least 90 percent of the time. The VE testified there would be a significant number of jobs in the national economy as well as in West Virginia that the hypothetical individual could perform (R. 59-63).

Dr. Masih faxed a patient referral for the Plaintiff to Dr. Ziad Yafi at a pain clinic on May 19, 2008, requesting evaluation for injection for Plaintiff's back pain(R. 518). There is no further documentation in the record regarding this referral.

A prescription print-out dated May 21, 2008, provides prescriptions that were filled for the Plaintiff from March 30, 2007 thru May 19, 2008. This is the last record submitted prior to the ALJ's decision which was entered on June 17, 2008 (R. 20).[5] Plaintiff's Request for Review by the Appeals Council was received by SSA on August 4, 2008.

## Evidence Submitted Post-ALJ Decision

On April 1, 2008,[6] Plaintiff presented for the first time to psychiatrist Christine Goldizen for a Psychiatric Evaluation on referral from her attorney (R. 544). Plaintiff reported a several-year history of depression and anxiety resulting from chronic pain. Plaintiff reported worrying over finances and her children "as unable to work." She could only sleep upright in a chair, and had decreased appetite and energy, and poor memory and concentration. She reported frequent panic

---

[5]Plaintiff requested hearing by ALJ on March 13, 2008. She filed a Critical/Dire Need Request, which was approved on April 30, 2008. The hearing was held on May 16, 2008. The claim therefore appears to have been expedited at Plaintiff's request.

[6]The Mental Assessment completed that same day, and opining that Plaintiff had listing-level mental impairments was submitted prior to the hearing, and was discussed in the section dealing with evidence before the ALJ.

attacks and had to have family and friends come help with daily chores. She lived with her two children, ages 7 and 9. The 9 year old had Charcot-Marie-Tooth disease (atrophy) and Asperger's disorder.[7]

Upon Mental Status Examination, Plaintiff was appropriately dressed and cooperative (R. 545). Eye contact was fair. She moved around in her chair "in an attempt to get comfortable." Her affect was constricted, mood depressed, speech normal, thought processes intact, and thought content normal. She had no hallucinations, delusions, or suicidal or homicidal ideations. Her judgment, impulse control, and insight were all good. She was fully oriented and alert. Regarding attention, she was found to be easily distracted. She had problems with immediate and recent memory, but her intellectual functioning was average and comprehension was normal. Dr. Goldizen diagnosed Major Depressive Disorder, single episode, moderate; and Anxiety Disorder, NOS (R. 546). Her GAF was 60.

This was the only meeting Plaintiff had with Dr. Goldizen prior to the Administrative Hearing, which was held on May 16, 2008.

Plaintiff was a "no show" for her second appointment with Dr. Goldizen on May 19, 2008 (R. 543).

Plaintiff presented to Dr. Goldizen for a 15-minute medication management appointment on June 5, 2008 (R. 542). On that date her affect remained constricted, and she reported her sleep and energy were decreased. Regarding hallucinations, she now reported hearing "things outside."

---

[7]The essential features of Asperger's disorder are severe and sustained impairment in social interaction . . . and the development of restricted, repetitive patterns of behavior, interests, and activities . . . . The disturbance must cause clinically significant impairment in social, occupational, or other important areas of functioning . . . . DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV"), 75 (4th ed. 1994).

Plaintiff reported being "more down." Her primary care physician increased her Cymbalta with no benefit and changed her to Xanax, also with no benefit. She "decided to come back here as [primary care physician] leaving." Dr. Goldizen discontinued Xanax and prescribed Valium. She decreased the Cymbalta and continued Wellbutrin and Trazadone.

The ALJ entered her Decision on June 17, 2008.

Hugh Marr, M.D. evaluated Plaintiff, preparing a Clinical Evaluation Summary on July 11, 2008, which provides as follows:

> Ms. Sites is a 25 year old woman who presented neatly dressed and made up. She complained of numerous symptoms, including nightmares, flashbacks, depression, anxiety (including panic attacks), migraines, poor concentration and memory loss, agoraphobia, and herniated discs. She is a single mother of nine and eight year old girls; the nine year old has Asperger's, and the eight year old ADHD. She states she is on her fourth social security appeal for which she has an attorney. Ms. Sites reports a history of trauma and abuse since the age of three when she was beaten until she bled by her mother's boyfriend after she walked in on him and her mother having sex. This began a long history of abusive relationships, including two marriages (one for six years, the other for two). Her last relationship was with a Hispanic alcoholic man who hit her in the head with a television. He was deported, but she lives in fear he will return.[8]
>
> Her memory complaints included forgetting doctors' appointments and forgetting what she went to the store for. She was given selected subtests from the Cognistat to assess cognitive functioning. On Digit Span (a measure of concentration), she was not able to remember three digits (the average is seven); and on the short term memory list, she was not able to recite four words two times in a row immediately after hearing them (even given three trials). Her concentration may have been decreased by headache and by response slowing; but it is not likely that this was an accurate measure of her memory. At this severe level she would be having far more problems than forgetting appointments - such as difficulty dressing, getting lost when leaving home, inability to read, leaving items on the stove, disorientation, etc., which

---

[8]At her examination by Dr. Stein on July 12, 2007, Plaintiff denied any previous physical and emotional trauma or current posttraumatic stress symptoms. At her examination by Ms. Murphy on April 1, 2008, Plaintiff reported having been physically abused by her mother's boyfriend when she was a child, but denied any history of abuse besides that. There is no previous account of her being hit in the head with a television.

she did not exhibit or complain about. Her abstract thinking was also in the seriously impaired range, but she got the first abstraction, then seemed to give up on the rest. This shows she got the concept of abstraction, which someone with truly concrete thinking would not. Similarly in the judgement questions she scored in the moderately impaired range largely because her response to most hypothetical situations was "I'd just cry" or "I'd have a panic attack." She responded appropriately to the most difficult question (perhaps because it concerned a child), again suggesting that her ability far outpaces her performance. On the trauma scale, the TSC, previously given her, she scored very high on the validity scale of Atypical Responding. Because of the variability in performance she was given the M-Fast, a measure of malingering. She did not meet the cut-off for probable malingering. Depression and dissociation may be potential factors. A review of the evaluation performed at Potomac Highlands Guild will be helpful. Ms. Sites would like trauma therapy, and this seems appropriate given her history. Services should be coordinated by the guild.

Dr. Marr diagnosed Generalized Anxiety Disorder and Rule Out Borderline Personality Disorder (R. 559).

Plaintiff cancelled her next (third) appointment with Dr. Goldizen, which had been scheduled for July 16, 2008 (R. 541).

In a medical management note dated July 30, 2008, Dr. Goldizen found Plaintiff's affect still constricted. Plaintiff reported her sleep and energy were still decreased (R. 540). The psychiatrist noted Plaintiff "still focuses on somatic complaints and getting SSI (denied). Still depressed. No benefit with Trazodone. In therapy with Baker (Patricia)." Dr. Goldizen discontinued Trazodone and increased Wellbutrin.

An MRI of the Plaintiff's lumbar spine without contrast on August 6, 2008, revealed Grade I anterolisthesis of L5 and S1, with encroachment upon the bilateral L5 nerve root along the neural foramen; and central to left paracentral disc herniation at T12-L1 level causing mild left lateral recess stenosis and encroachment upon the conus (R. 560).

Dr. Goldizen prepared a Psychiatric Review Technique ("PRT") and Mental Residual

28

Functional Capacity Assessment ("MRFC") on August 27, 2010 (R. 522-539). She opined that Plaintiff had depression and an anxiety disorder, checking off the box stating the anxiety consisted of "[r]ecurrent, severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week." She opined that Plaintiff met Listings 12.04 and 12.06, finding that she had a "marked" restriction of activities of daily living; "marked" difficulties in maintaining concentration, persistence, or pace; moderate difficulties in maintaining social functioning; and had had one or two repeated episodes of decompensation, each of extended duration.

In her Mental RFC, Dr. Goldizen opined that Plaintiff would be markedly limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal work-day and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and travel in unfamiliar places or use public transportation (R. 536-537). She would have moderate limitations on her ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; set realistic goals or make plans independently of others understand and remember detailed instructions; carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; and make simple work-related decisions (R. 536-537).

The above limitations are referred to by SSA as **SUMMARY CONCLUSIONS**. At the end

of the form, the evaluator is asked to:

> Record in this section the elaborations on the preceding capacities. Complete this section **ONLY** after the **SUMMARY CONCLUSIONS** section has been completed. Explain your summary conclusions in narrative form. Include any information which clarifies limitations or function. Be especially careful to explain conclusions that differ from those of treating medical sources or from the individual's allegations.

Significantly, in response to the above instructions, psychiatrist Goldizen wrote only:

> I do feel limitations more related to physical problems that as a psychiatrist I can not speak to.

(R. 538).

## III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ Cannon made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2. The claimant has not engaged in substantial gainful activity since March 30, 2007, the alleged onset date (20 CFR 404.1520(b) and 404.1571 et seq., 416.920(b) and 416.971 et seq.).

3. The claimant has the following severe impairments; chronic cervical and lumbar sprains and strains; asthma; and affective disorder (20 CFR 404.1520(c) and 416.920 (c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520 (d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with a sit/stand option; no climbing of ladders, ropes or scaffolds; should avoid extremes of hot and cold, vibrations, fumes, odors, gases, kneeling, and crawling; no exposure to workplace hazards such as unprotected heights and dangerous moving machinery; work must be unskilled (simple

routine/repetitive instructions and tasks, no requirement for intense concentration, primarily focuses on things rather than people, and entry level); and requiring no more than minimal contact with the public.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on November 16, 1982 and was 24 years old, which is defined as a younger individual, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 an 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560 (c), 404.1566, 416.960 (c), and 416.966).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from march 30, 2007 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 10-20).

## IV. Discussion
### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v.

NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1. First, the ALJ erred by failing to give the treating physician's opinions significant weight.

2. Second, the ALJ erred by failing to properly evaluate and determine the Plaintiff's mental impairments.

3. Updated reports regarding the Plaintiff's mental impairments were received and accepted by the Appeals Council but were not considered or discussed.

Defendant contends:

1. The ALJ appropriately considered and weighed the evidence.

2. The ALJ's RFC contains mental limitations that are consistent with Plaintiff's activity level and the findings of Ms. Murphy, Dr. Stein, and Dr. Nutter.

3. The Appeals Council incorporated the submitted evidence into the record and addressed it by stating that "this information does not provide a basis for changing the Administrative Law Judge's decision."

## C. Weight Given to Opinions

Plaintiff first argues that the ALJ erred by failing to give the treating physicians' opinions significant weight. Defendant contends the ALJ appropriately considered and weighed the evidence. Plaintiff first argues that the ALJ erred in according Dr. Masih's opinion that she could not work a full or part time job entitled to little weight. Dr. Masih wrote an undated letter, which was faxed to the ALJ on May 16, 2008, the day of the hearing (R. 516). The letter states, in *toto*:

> To Whom it May Concern:
>
> With Tayna [sic] Morales' physical and emotional disabilities will make it impossible to hold a full or part time job in the economy.

This opinion is properly accorded little weight. Under 20 CFR 404.1527(e) and 416.927(e), some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability. Dr. Masih's opinion that Plaintiff's disabilities make it impossible for her to hold any job is an example of such an administrative finding. The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner. Treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance.[9] Therefore, Dr. Masih's unsupported opinion that Plaintiff's mental and physical impairments made it impossible for her to hold a job was not entitled to any special significance.

Additionally, in <u>Craig v. Chater</u>, 76 F.3d 585, 590(4th Cir. 1996), the Fourth Circuit held:

---

[9]Significantly, it is the ALJ herself who identifies Dr. Masih as a treating physician. It appears to the undersigned that Plaintiff for the most part was examined by physician's assistants, perhaps, however, in Dr. Masih's office and under his supervision.

Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

Here, the ALJ found Dr. Masih's opinion that Plaintiff could not perform any work was both unsupported and inconsistent with other substantial evidence in the record. First, although Dr. Masih includes both Plaintiff's mental and physical impairments, it is important to note that he is not a psychologist or psychiatrist. Second, regarding her mental impairments, Plaintiff never saw a mental health practitioner until six weeks before the administrative hearing. Even then she apparently did not go for treatment, but "in order to present more information to Social Security regarding her disability claim."

Although Dr. Stein, an examining psychologist, found Plaintiff's concentration and pace moderately slow, he also noted Plaintiff's own self-reported daily activities of arising at 8:30; taking care of her own personal hygiene; then waking up her daughters; helping them dress; feeding them; straightening up the house; doing light household activities; supervising the children cleaning their bedroom; fixing lunch eating with her children; driving them to her grandmother's; taking them to the park and watching them play; fixing supper; eating with the children; cleaning the kitchen; and supervising their bath and bedtimes. She regularly cooked, occasionally cleaned, and regularly washed dishes and did laundry. She occasionally shopped for groceries, ran errands, regularly drove,

occasionally went to restaurants, and regularly visited with relatives.

Examining psychologist Murphy diagnosed Major Depressive Disorder, Single Episode; Anxiety Disorder, NOS; and Personality Disorder NOS. She assessed her GAF as 60, exactly at the cut-off between moderate symptoms or difficulties and mild symptoms or difficulties. Her prognosis was good.[10]

Further, State agency reviewing psychologists found Plaintiff did not even have a severe mental impairment, but instead had only mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. Dr. Kuzniar particularly noted that Plaintiff lived at home with her two children, and took care of them and herself. She enjoyed taking her kids to the park, and did prepare meals and do laundry, although a friend helped her. Dr. Shaver noted in particular Plaintiff's own function report of only two months earlier, in which she stated she lived with and took care of her two minor children (one with a compensable disability); had help from her grandmother, but did perform housework; performed personal care tasks but experienced pain; was able to go out alone and drive; shopped once or twice per week for short periods of time (due to pain); and went to church regularly. Dr. Kuzniar expressly disagreed with Dr. Stein's finding of moderately impairment memory, noting "[t]hese were not evidenced in the function report."

20 CFR § 404.1527(f)(2)(i) provides:

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative

---

[10]The undersigned will discuss Dr. Goldizen's opinion below.

law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

The ALJ was therefore required to consider the State agency physicians' and psychologists' opinions, which were persuasive evidence inconsistent with Dr. Masih's letter opinion.

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's according little to no weight to Dr. Masih's opinion that Plaintiff could perform no full or part time work.

The undersigned cannot find substantial evidence supports the ALJ's finding regarding Dr. Masih's Medical Source Statement of Ability to Do Work-Related Activities (Physical), however. In what the undersigned finds is otherwise a very thorough and well-supported decision, there is an inconsistency that cannot be ignored. Dr. Masih, according to the ALJ, is a treating physician. He clearly opined that Plaintiff could lift/carry 20 pounds occasionally and frequently lift/carry ten pounds. This puts Plaintiff at the light exertional level, as found by the ALJ. However, Dr. Masih further opines that Plaintiff can stand/walk "at least 2 hours in an 8-hour workday." He specifically did not check off the box for walk to stand/walk "about 6 hours in an 8-hour workday." Social Security Ruling ("SSR") 83-10 provides, in pertinent part:

> Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing - - the primary difference between sedentary and most light jobs . . . .
>
> "Frequent" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time . . . .

(Emphasis added). According to Dr. Masih's assessment, therefore, Plaintiff could not perform work

at the light exertional level. The ALJ, however, states:

> Dr. Masih also completed a physical residual functional capacity indicating the claimant retained the physical residual functional capacity to perform light work.
>
> The undersigned believes this is a correct assessment but has added additional postural and environmental limitations based on objective findings and the claimant's subjective statements.

(R. 18). Nor did the ALJ ask a hypothetical including a light exertional level but with a limitation on standing and walking. This omission becomes more important in this case because of the very few jobs at the local level identified by the VE even without the limitation on walking. Although there would clearly be a significant number of jobs available in the national economy, the number of jobs available in the local economy totaled 282.

Additionally, the undersigned cannot find this error harmless, because, although the VE also identified jobs Plaintiff could perform at the sedentary level, there is also no support in Dr. Masih's assessment for a finding she could work at the sedentary level. Pursuant to 83-10, "sitting should generally total approximately 6 hours of an 8-hour workday." Dr. Masih opined Plaintiff could sit only a total of "less than about 6 hours in an 8-hour workday."

The ALJ did not precisely state what weight she accorded Dr. Masih's opinion as stated in the assessment. She did, however, say she believed his opinion that she had the physical residual functional capacity "to perform light work" was "correct." This finding is clearly an error, as Dr. Masih did not find Plaintiff could work at the light exertional level. Incidentally, he also did not find she could work at the sedentary exertional level.

This is not to say that Plaintiff must be found disabled based on Dr. Masih's assessment. The undersigned, however, cannot find substantial evidence supports the ALJ's RFC, the hypotheticals

based on that RFC, or the ultimate conclusion that there are jobs Plaintiff could perform in the national economy. This claim should therefore be reversed and remanded to the Commissioner for the sole purpose of clearing up the inconsistency in the decision, determining Plaintiff's proper RFC, and determining whether there are a substantial number of jobs that exist in the national economy that an individual of Plaintiff's background and RFC could perform.

Regarding Dr. Goldizen's opinion, the undersigned finds that, relying on the record as it existed at the time of the ALJ's decision, Dr. Goldizen was not a treating psychiatrist, as argued by Plaintiff. On April 1, 2008, the same day Plaintiff was evaluated by Ms. Murphy, she was evaluated by psychiatrist Christine Goldizen, M.D., upon referral by counsel (R. 463). Ms. Goldizen completed a "Mental Impairment Questionnaire" on April 2, 2008. She expressly noted on the form that she had seen Plaintiff only that one time, for an evaluation. She also noted that results of the psychological evaluation/testing were "pending" (R. 467). That is the only record that was before the ALJ.

Additionally, according to the evidence submitted months after the ALJ's decision, Plaintiff was a "no show" for her second scheduled appointment with Dr. Goldizen on May 19, 2008. She finally did appear for a 15-minute medication management appointment on June 5, 2008. A notation that Plaintiff "decided to come back here as PCP leaving," is evidence that Plaintiff had not planned, at the time of the April 1, 2008, evaluation, for Dr. Goldizen to treat her. In fact, according to the record, Plaintiff saw Dr. Goldizen only one more time, for another 15-minute medication management appointment, on July 30, 2008, for a total of one examination and two 15-minute appointments in five months.

The undersigned therefore finds the ALJ could properly reject Dr. Goldizen's opinion of

April 1, 2008.  Dr. Goldizen was, at least at the time, an examining psychiatrist.  As such, her opinion was not entitled to the weight accorded a treating physician.  "By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."  The ALJ found Dr. Goldizen's opinion regarding Plaintiff's limitations was not supported by the evidence and was inconsistent with other substantial evidence.  The undersigned agrees.  Plaintiff was able to drive 350 miles to go to hers and her daughter's appointments.  She cared for two pre-adolescent girls, one with a disabling impairment, albeit with help from friends and family.  She went to church regularly.  Although she alleges frequent and disabling panic attacks, she never had one at church or other outside events.  Her grandmother, who was frequently at Plaintiff's home to help her, had never seen Plaintiff have such an attack.  Less than a year before Dr. Goldizen's assessment, Plaintiff reported her daily activities as arising at 8:30, taking care of her personal hygiene, trying to limber up, smoking cigarettes, taking a shower, and dressing.  She then woke up her daughters, helped them dress, fed them, tried to straighten up the house, did light household activities and supervised the children cleaning their bedroom.  She fixed lunch and ate with her children and drove them to their grandmothers.  Some days she took them to the park and watched them play.  Later she fixed supper, ate with the children, cleaned the kitchen, supervised their bath and bedtime routine.  She regularly cooked, occasionally cleaned, and regularly washed dished and did laundry.  She occasionally shopped for groceries, ran errands, and regularly drove.  She said at that time she did not attend church.  She occasionally went to restaurants and regularly visited with relatives.

Dr. Shaver found Plaintiff had no severe mental impairment, based on her own functional report from November 2007, only five months before Dr. Goldizen's evaluation.  He noted she stated

she lived with and took care of her two young children, prepared meals and took them to school, had help from her grandmother with housework, performed personal care tasks, but with pain, was able to go out alone and to drive, shopped once or twice a week, and went to church regularly.

The first Disability Report that mentioned disabling panic attacks was dated March 30, 2008, one day before Plaintiff was evaluated by Dr. Goldizen. Plaintiff stated that "Panic attacks drain me to 2 days when they happen, more often now 1x a week at least." Yet Dr. Goldizen opined that Plaintiff's mental impairments "began several years ago."

Dr. Goldizen opined that Plaintiff would have poor ability to maintain attention for two hour segments; maintain regular attendance; complete a normal workday and workweek without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and travel in an unfamiliar place. Dr. Goldizen also opined that Plaintiff would have a marked restriction of activities of daily living; moderate difficulties maintaining social functioning; marked deficiencies of concentration, persistence or pace; and had three episodes of deterioration or decompensation in a work or work-like setting." These restrictions are at listing level, meaning that Plaintiff would be considered disabled due to her mental impairments alone, according to Dr. Goldizen. These restrictions are not only unsupported by the evidence and inconsistent with other substantial evidence, but are inconsistent with Dr. Goldizen's GAF of 60, which indicates, at the very most, "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." Dr. Goldizen's opinion is also inconsistent with and unsupported by every other examining and reviewing psychologists' opinion.

Upon consideration of all of the above, the undersigned finds substantial evidence supports the ALJ's rejection of Dr. Goldizen's opinion regarding Plaintiff's mental limitations.

### D. Mental Impairments

Plaintiff also argues that the ALJ erred by failing to properly engage in the mental special technique for evaluating mental impairments provided in 20 C.F.R. section 404.1520a. The undersigned disagrees and finds the ALJ's decision reflects proper use of the technique. The ALJ first determined Plaintiff had a medically determinable mental impairment. She then rated the degree of Plaintiff's functional limitations in the four functional areas, finding Plaintiff would have a mild restriction on activities of daily living; mild difficulties in social functioning; moderate difficulties with concentration, persistence or pace, and had no episodes of decompensation. The undersigned finds substantial evidence supports the ALJ's findings, in particular Plaintiff's own reports of daily activities. As did the ALJ, the undersigned finds significant the fact that Plaintiff cared for two pre-adolescent children, one of whom has a compensable disabling impairment of her own.

In regard to this issue, the undersigned also finds significant the fact that the State agency reviewing psychologists found Plaintiff had no severe mental impairment, based for the most part on her own daily activities. As the ALJ stated:

> As for the opinion evidence, state agency medical consultants have opined that the claimant has no severe mental impairment.
>
> The Administrative Law Judge has given the claimant the benefit of any doubt and rejected these opinions to find that the claimant's depression results in moderate difficulty in maintaining concentration, persistence and pace. Appropriate limitations are included in the claimant's residual functional capacity.

Having found Plaintiff had no "marked" restrictions of function, the ALJ then appropriately found Plaintiff's mental impairments did not meet or equal a listed mental disorder. As required in the Regulation, she then assessed Plaintiff's residual functional capacity, including limitations due to

mental impairments. She found Plaintiff's work must be unskilled, with simple routine/repetitive instructions and tasks, no requirement for intense concentration, primarily focusing on things rather than people, at the entry level, and requiring no more than minimal contact with the public. The undersigned finds substantial evidence supports the ALJ's RFC in regard to Plaintiff's functional limitations based on her mental impairments.

Plaintiff in particular argues that the ALJ erred by disregarding "treating physician" Goldizen's opinion that Plaintiff had marked difficulties in activities of daily living and marked limitations in concentration, persistence and pace (Plaintiff's brief at 12). As already found, Dr. Goldizen could not be considered a treating physician at the time of her opinion. Further, as also already found, substantial evidence supports the ALJ's rejection of that opinion. Plaintiff argues that "[u]pdated" reports regarding the Plaintiff's mental impairments were received and accepted by the Appeals Council but were not considered or discussed." This argument will be discussed later in this decision. These reports were simply not before the ALJ for her consideration. Plaintiff also argues:

> It should be noted that the ALJ's discussion of medical opinions at the Step 3 analysis under Finding 4 never even mentioned Dr. Goldizen or considered or explained her obviously relevant opinions.

Although the ALJ did not mention Dr. Goldizen's opinion at Step 3, she clearly considered that opinion in making her decisions. Upon consideration of all of the above, the undersigned finds the ALJ appropriately evaluated Plaintiff's alleged mental impairments and further finds substantial evidence supports the ALJ's findings regarding Plaintiff's mental impairments.

### E. Evidence Before the Appeals Council

Plaintiff finally argues:

> Updated reports regarding the Plaintiff's mental impairments were received and accepted by the Appeals Council but were not considered or discussed. Said reports include listing level mental impairments along with notes of treatment (TR. 522-38). Also, the updated medical records support the conclusion that the ALJ failed to take the Plaintiff's mental impairments seriously.

Pursuant to 20 CFR § 404.970(b), the Appeals Council shall consider evidence submitted with a request for review if the evidence is new, material, and relates to the period on or before the dates of the ALJ's decision. Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome. Wilkins v. Secretary, Dept. of Health and Human Services, 953 F.2d 93, 96 (4th Cir. 1991). Evidence is not "new" if other evidence specifically addresses the issue. See Id. at 96.

In this case, the Appeals Council did receive and accept the new evidence. The Appeals Council incorporated the evidence into the record. The Appeals Council decision stated: "In looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeal Council. We found that this information does not provide a basis for changing the Administrative Law Judge's decision" (R. 1-2). The undersigned agrees.

The first document submitted to the Appeals Council after the ALJ's decision is the actual office record of the Psychiatric Evaluation performed by Dr. Goldizen on April 1, 2008, and upon which the Mental Residual Capacity Assessment was based. This document is cumulative and not material because it actually reinforces that Dr. Goldizen was, at the time, an examining, not treating, physician. It also restates that Plaintiff lives alone with her two children, ages 9 and 7, and that the 9-year-old has Charcot-Marie-Tooth and Asperger's disorder. Dr. Goldizen diagnosed major depressive disorder, single episode, moderate, and anxiety disorder, NOS, which was already in the

record, along with her assessment of Plaintiff's GAF as 60. Dr. Goldizen recommended continued follow-up with Plaintiff's primary care provider "as pleased [with] progress" and recommended psychological testing and counseling. Plaintiff was a "no show" for a second appointment with Dr. Goldizen, finally presenting to her again on June 5, 2008, for a medical management appointment. At that time, Plaintiff "decided to come back here as PCP leaving." Again, this reinforces the earlier finding that Dr. Goldizen was not a treating physician at the time of her April opinion.

A Clinical Evaluation Summary by Hugh Marr, M.D., at Hawse Health Center, prepared on July 11, 2008, is new (not cumulative) evidence. Plaintiff, however, reported new symptoms, including nightmares, flashbacks, and agoraphobia. These are either not credible, or show Plaintiff became worse after the ALJ's decision, and are therefore not relevant to the time frame at issue. While testing showed Plaintiff had severe memory and concentration problems, a review of his report indicates Dr. Marr voiced serious concerns about the accuracy of the results. Most significantly, he opined that if her memory was a bad as the test results showed, she would have difficulty dressing, would get lost when leaving home, would be unable to read, and would leave items on the stove, none of which she reported. He also questioned the validity of the results of the abstraction and judgment tests. Dr. Marr diagnosed Plaintiff only with Generalized Anxiety Disorder and Rule Out Borderline Personality Disorder.

Plaintiff cancelled her next (what would have been her third) appointment with Dr. Goldizen scheduled for July 16, 2008 (R. 541).

In a medical management note dated July 30, 2008, Christine Goldizen, M.D., found Plaintiff's affect still constricted and her sleep and energy still decreased, but also noted Plaintiff

"still focuses on somatic complaints and getting SSI (denied)."

Dr. Goldizen prepared a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment on August 27, 2010, opining that Plaintiff had an affective disorder (depression) and an anxiety disorder. She opined that Plaintiff met Listings 12.04 and 12.06, finding that she had a "marked" restriction of activities of daily living; "marked" difficulties in maintaining concentration, persistence, or pace; moderate difficulties in maintaining social functioning; and had had one or two repeated episodes of decompensation, each of extended duration. Dr. Goldizen also completed a Mental RFC, in which she again opines that Plaintiff would have marked work-related functional limitations. These opinions are nearly identical to those submitted by Dr. Goldizen in April 2008, and which the undersigned has already found were properly rejected by the ALJ as being unsupported and inconsistent with other persuasive evidence in the record. Plaintiff may argue that the Appeals Council should take into account that Dr. Goldizen was now actually treating Plaintiff; however, the record shows that this second report was completed after Dr. Goldizen had seen Plaintiff for the one examination and two 15-minute medication management appointments over a period of five months. The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983). Substantial evidence supports a finding that Dr. Goldizen, although apparently now seeing Plaintiff intermittently and prescribing medications, had not had a continuing observation of her condition over a prolonged period of time.

Of more significance to the undersigned, all the limitations contained in the Mental RFC are

referred to by SSA as SUMMARY CONCLUSIONS. At the end of the form, the evaluator is asked to:

> Record in this section the elaborations on the preceding capacities. Complete this section ONLY after the SUMMARY CONCLUSIONS section has been completed. Explain your summary conclusions in narrative form. Include any information which clarifies limitations or function. Be especially careful to explain conclusions that differ from those of treating medical sources or from the individual's allegations.

Significantly, in response to the above instructions, psychiatrist Goldizen wrote only:

> I do feel limitations more related to physical problems that as a psychiatrist I can not speak to.

(R. 538).

Upon consideration of all which the undersigned finds substantial evidence supports the Appeals Council's determination that the evidence submitted after the ALJ's decision was not material, in that it would not have reasonably changed the ALJ's decision.

## V. CONCLUSION

Based on all of the above, the undersigned United States Magistrate Judge finds substantial evidence supports the ALJ's decision with the exception of her finding that Plaintiff could work at the light exertional level, based, at least in part, on Dr. Masih's opinion.

## VI. RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for SSI and DIB is not supported by substantial evidence, and I accordingly **RECOMMEND** that Defendant's Motion for Summary Judgment be **DENIED**, and that Plaintiff's Motion for Summary Judgment be **GRANTED IN PART** by reversing the Secretary's decision

under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Secretary for further proceedings consistent and in accord with this Recommendation.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _7_ day of _August_, 2010.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE